IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

OREGON POTATO COMPANY, doing business as
RADER FARMS,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION and ORDER |
| v. | | |
| | | 20-cv-92-jdp |
| KERRY INC., | | |
| | Defendant. | |

---

The dispute in this case arises out of a failed business relationship between a company that makes smoothie mixes and a supplier of yogurt cubes, which is one of the mix's ingredients. Both plaintiff Oregon Potato Company (OPC) and defendant Kerry, Inc. move for summary judgment. Dkt. 114 and Dkt. 120.

The parties raise many issues in more than 400 pages of briefing, but the key dispute is whether Kerry unreasonably delayed in fulfilling OPC's orders for yogurt cubes in 2019, justifying OPC's decision to cancel the parties' contracts and sue for damages. The court concludes that neither party has shown that it is entitled to summary judgment on that issue because it turns on the reasonableness of the parties' conduct, a question within the purview of the jury. OPC's contract claims will proceed to trial, but the court will grant summary judgment to Kerry on OPC's promissory estoppel claim and claim under the Washington Consumer Protection Act, as well as on some damages issues. The court will grant summary judgment to OPC on Kerry's affirmative defenses for waiver, estoppel, impracticability, and failure to mitigate damages.

UNDISPUTED FACTS

The material facts are undisputed.

Since 2017, OPC has had a license to make and sell "Jamba At Home Smoothies," which OPC distributes to grocery stores and other retailers. One ingredient of the smoothies is a yogurt cube. From 2017 to 2019, OPC purchased the yogurt cubes from Kerry, which manufactures food, beverages, and pharmaceutical products.

In 2018 and 2019, OPC sent purchase orders to Kerry by email, and Kerry would respond by email with an order acknowledgment. This case is about purchase orders that OPC placed from January 2019 to May 2019. The parties' claims and defenses depend largely on these purchase orders and related communications, so the court will review them in some detail here.

In January 2019, OPC sent Kerry purchase order no. 20504 for 1,152 cartons of cubes with a requested a March 1 pick-up date. Kerry responded with an order acknowledgment that identified March 18 as both the "ship date" and the "delivery date." (It appears to be undisputed that the products generally weren't shipped or delivered to OPC, but rather OPC picked up the product directly from the facility. Dkt. 164, ¶ 22.) The order acknowledgement was accompanied by an email stating that "[t]he plant has confirmed the soonest ship dates . . . . Dates provided are based upon delivery of raw material and are subject to change depending upon delivery of said raw material." On February 12, OPC replied by "thank[ing] [Kerry] for the confirmation."

On March 15, Kerry informed OPC that it would be able to provide by March18 only 462 cartons of the 1,152 cartons of yogurt cubes that OPC ordered. Kerry wrote that there was a power outage at the facility and that the full order wouldn't be complete until "early May."

2

In response, OPC directed Kerry to "ship this full in May." Kerry sent a revised order acknowledgement, identifying May 6 as the "ship date" and May 10 as the "delivery date."

Also on March 15, OPC sent Kerry purchase order nos. 21909 and 21908, both for 1,152 cartons and both with a requested pick-up date of April 29. Kerry responded with an order acknowledgment that identified May 6 as both the "ship date" and the "delivery date." An accompanying email included the same qualifying language about "the soonest ship dates" and that "dates are subject to change depending on delivery of raw material."

In April, Kerry informed OPC that its orders "will not be ready for pick up until July 1" because of "production delays" and "a mechanical issue." In response, OPC wrote that the delay "is going to place our customer out of stock," but OPC didn't cancel any of its orders at that time.

On May 1, OPC informed Kerry that OPC would have to "formulate out of [Kerry's] products if [Kerry] can't produce [OPC's] products on time." Kerry wrote that it was "dealing with some capacity restraints" and was "working to improve [OPC's] ship dates."

On May 7, OPC asked Kerry to provide the 462 cartons that it had previously indicated were available for the January order. Kerry provided 485 cartons on May 13.

On May 9, OPC sent Kerry purchase order nos. 23222, 23223, 23224, 23225, 23226, and 23227 for several different flavors of yogurt cubes. On May 10, OPC submitted purchase order no. 23269 to account for the unfilled portion of its January 15 order. The May 9 purchase orders requested a June pick-up date; the May 10 purchase order didn't include a requested pick-up date. In response, Kerry sent order acknowledgements identifying July 1 as both the "ship date" and the "delivery date" for five of the purchase orders and July 15 as the date for two of the orders. An email accompanying all of the order acknowledgements directed OPC to

review the "estimated delivery date" and warned that "the requested ship date and delivery date on the [purchase order] are not always able to be met due to raw material availability, lead time and/or production capacity." Kerry sent a separate email in response to the May 9 purchase orders that included the following language: "Please note that each of [the purchase orders] details an update to the ship date on your orders. At this time the date is firm and cannot be improved. We apologize for any inconvenience this may cause you." In response to that email, OPC wrote, "thank you."

On May 15, Kerry informed OPC that Kerry was "unable to improve the July ship date." In response, OPC wrote it will "start formulating items without Kerry ingredients."

On May 31, Kerry informed OPC on a conference call that Kerry would not be able to fulfill any of their orders until November 2019.

On June 3, Kerry offered to give OPC the product formulas for the cubes if OPC agreed to "waive any action or damages that it may otherwise have asserted." OPC responded that it would "not be waiving any actions or damages."

In June 2019, representatives of Focus Brands, which owns the rights to the Jamba brand, contacted Kerry on OPC's behalf, asking Kerry to "please look into this asap." On July 8, Kerry asked Focus how much product OPC needed to "bridge supply till 2020." On July 9, Focus told Kerry that OPC would need more than 100,000 pounds of yogurt cubes. On July 15, Kerry wrote that it would "be able to manufacture these products by the end of Sept. Exact dates forthcoming." Focus wrote that "[i]t may be tough for [OPC] to go that long without yogurt cubes."

On July 25, OPC submitted revised purchase orders for all of its pending orders, seeking a pick-up date of August 15. OPC described this as "a desperate move to get inventory as soon

as possible, a drop-dead date." Kerry didn't provide any order acknowledgements in response. Instead, a Kerry employee wrote that she had "not had any communication from the plant stating any update from the Nov 1 that is currently listed." In response, OPC wrote: "If November 1 is the date, go ahead and cancel all the purchase orders in subject." On July 29, Kerry wrote: "We are processing the cancellations. Will there be any future orders this year? Our plant has the possibility for August production." Kerry didn't explain to OPC how Kerry would be able to fill orders in August. As of July 29, Kerry didn't have all the raw materials it would need to fulfill OPC's orders.

On July 31, a Kerry representative asked OPC whether shipping dates between August 22 and August 30 would "work" for OPC. If so, the representative would get "updated confirmations from our plant."  Again, Kerry didn't explain how it would meet those dates in light of its previous statements, and it didn't identify any new circumstances that would permit quicker production. An OPC employee wrote that she would "ask management and get back to" Kerry.

On August 2, OPC wrote to Kerry that OPC had "cancelled all of the late and unfulfilled open orders." In a separate communication, OPC told Kerry that it wasn't ordering any more product. On August 5, Focus also told Kerry that the order should be cancelled.

OPC is incorporated in Washington and its principal place of business is there. Kerry is incorporated in Delaware, and its principal place of business is in Wisconsin. The court has jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy is more than $75,000.

ANALYSIS

OPC is asserting claims against Kerry for breach of contract, promissory estoppel, and violations of the Washington Consumer Protection Act. For its part, Kerry asserts affirmative defenses for waiver, estoppel, impracticability, and failure to mitigate damages. One or both parties move for summary judgment on all of these claims and defenses. Kerry also moves for summary judgment on several damages issues.

## A. Breach of contract

A claim for breach of contract has three elements: (1) an enforceable contract between the parties; (2) a breach of the contract; and (3) damage. *Kaste v. Amery Reg'l Med. Ctr., Inc.*, 2016 WI App 75, ¶ 9, 371 Wis. 2d 759, 886 N.W.2d 592. There is no dispute that the parties' purchase orders and order acknowledgements created enforceable contracts. But the parties dispute whether Kerry breached any of those contracts, whether any breach is excused under one of Kerry's affirmative defenses, and whether OPC suffered any damages as a result of any breach. The parties assume that Wisconsin law applies to the breach-of-contract claims, so the court has done the same. *See RLI Insurance Company v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.").[1]

### 1. Material breach

OPC asserts two theories in support of its claim that Kerry breached its contracts with OPC: (1) Kerry repudiated the contracts on May 31, 2019, when it told OPC that it would not be able to fill its orders until November 2019; and (2) Kerry failed to fill the orders by the

---

[1] The parties do raise a choice-of-law issue for OPC's statutory claim, and the court will consider that dispute in the context of discussing that claim.

promised dates of July 1 and July 15, 2019. OPC doesn't allege breaches for any alleged failure to perform before May 31. *See* Dkt. 157, at 14 ("The promised ship dates for the Contracts were July 1, 2019 and July 15, 2019.").[2] Both parties move for summary judgment on the second theory, but only Kerry moves for summary judgment on the first theory.

### a. Time for performance

A threshold question for both of OPC's theories relates to the time for performance. OPC contends that Kerry agreed in its order acknowledgments to prepare OPC's orders by July 1 and July 15, so any delay in performance would qualify as a substantial breach. None of Kerry's order acknowledgments accepted the dates requested by OPC in its purchase orders, which would suggest there was simply no meeting of the minds on the time for performance, and thus no enforceable promise on that issue. *See Fricano v. Bank of Am. NA*, 2016 WI App 11, ¶ 29, 366 Wis. 2d 748, 770, 875 N.W.2d 143, 154 ("[N]o contract is formed until the counteroffer is accepted."). But OPC says that Kerry's order acknowledgments represented proposed modifications of the purchase orders, which OPC accepted when it sent Kerry emails thanking Kerry for the order acknowledgments. Kerry doesn't challenge that contention, so the court will assume that it is correct.

The parties dispute whether the dates in the order acknowledgment showed that "time is of the essence," such that any delay would qualify as a breach. Wisconsin law is clear that the presence of dates in a contract isn't dispositive:

> The importance of time in connection with the performance of a contract depends upon the nature of the contract, the terms of

---

[2] Kerry devotes a substantial portion of its briefs to arguing that it didn't breach its agreements with OPC before May 31. In light of OPC's focus on July 1 and July 15 as the relevant fulfillment dates, the court understands OPC to be abandoning any claims based on a failure to fulfill orders by earlier dates identified in some of the original order acknowledgments.

> the contract, and the circumstances appearing from the conduct of the parties. Time is not to be regarded as of the essence of the contract unless it is clear that the parties intended to make it so by their conduct or by the terms on which they have agreed.
>
> Time is not to be regarded as of the essence of the contract merely because a definite time for performance is stated in the contract, in the absence of any further provision regarding the effect of nonperformance at the time stated.

WIS JI-CIVIL 3048 (citing *Appleton State Bank v. Lee*, 33 Wis. 2d 690, 693, 148 N.W.2d 1 (1967)); *Wauwatosa Realty Co. v. Bishop*, 6 Wis. 2d 230, 94 N.W.2d 562 (1959); *Zuelke v. Gergo*, 258 Wis. 267, 45 N.W.2d 690 (1951); *Rottman v. Endejan*, 6 Wis. 2d 221, 226, 94 N.W.2d 596 (1959)). OPC contends that the above standard doesn't apply in the context of sales contracts, but it cites no authority for that view.

Kerry's emails accompanying the order acknowledgments show that Kerry was not promising to fulfill OPC's orders by a specific date. Those emails included qualifying language, stating that the delivery dates were "estimated" and that "dates are subject to change," so the parties' agreements anticipated that there might be delays.

OPC challenges the significance of the qualifying language on two grounds. OPC's first objection is that only the order acknowledgements themselves qualify as the parties' agreements, and the accompanying emails are parol evidence that the court should disregard. But OPC doesn't support that view. Kerry sent the emails and the order acknowledgements together, so it is reasonable to construe both documents collectively as Kerry's counteroffer. *See Peterson v. Cornerstone Prop. Dev., LLC*, 2006 WI App 132, ¶ 4, 294 Wis. 2d 800, 806, 720 N.W.2d 716, 719 (noting that multiple documents can collectively qualify as a counter-offer). The order acknowledgements don't contain any language indicating that they are to be construed as the entire agreement between the parties. Moreover, OPC's view is that its own

emails in response to Kerry's emails qualify as OPC's acceptance of OPC's counteroffers. OPC doesn't explain why its own emails may be considered but Kerry's may not be. And OPC didn't object in its own emails to the qualifying language in Kerry's emails, so OPC's "thank you" emails are reasonably construed as accepting the terms in both the order acknowledgments and the accompanying emails from Kerry.

OPC's second objection is that Kerry made other statements that the dates in the order acknowledgements were "promise dates." But the only evidence OPC cites for this is deposition testimony that Kerry sometimes referred to dates on the order acknowledgements as "promise dates" in their *internal* communications. Dkt. 169, ¶ 61. OPC doesn't cite any evidence that Kerry used that term in its order acknowledgments or any other communications with OPC, so the internal use of that term doesn't undermine the qualifying language that Kerry used in the emails accompanying the order acknowledgements.[3]

Although the parties' agreements show that Kerry did not promise to meet a strict deadline, this doesn't mean, as Kerry seems to suggest, that its delays cannot qualify as a material breach. Even if the parties' agreement doesn't require strict performance by a particular date, a party may not engage in unreasonable delay. *See Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 597 (7th Cir. 2009) (applying Wisconsin law); *Boyington v. Sweeney*, 77 Wis. 55, 45 N.W. 938, 941 (1890); 23 Williston on Contracts § 63:18 (4th ed.)

---

[3] In addition to the qualifying language in the emails, Kerry relies on a spreadsheet purporting to show that many of OPC's 2018 orders were delayed, which Kerry says is evidence of a course of dealing under Wis. Stat. § 402.208 that OPC didn't expect strict adherence to fulfillment dates. Dkt. 115-1. But Kerry doesn't explain where the information in the spreadsheet comes from, how the authenticating witness has personal knowledge of it, when it was created, who created it, or whether it was created in the ordinary course of business, as required by Federal Rule of Evidence 803(6). Without that information, the court can't consider the document.

(citing *M & I Marshall & Ilsley Bank v. Pump*, 88 Wis. 2d 323, 333–34, 276 N.W.2d 295, 299–300 (1979)). Even when no time for performance is identified in a sales agreement, a party must complete performance in a "reasonable time." Wis. Stat. § 402.309(1). What's reasonable depends on the circumstances. *See* WIS JI-CIVIL 3048.

With these principles in mind, the court turns to OPC's two theories for breach of contract.

### b.   Breach by repudiation

Repudiation, or anticipatory breach, of a sales contract is governed by Wis. Stat. § 402.610, part of Wisconsin's implementation of the Uniform Commercial Code:

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:
>
> (1) For a commercially reasonable time await performance by the repudiating party; or
>
> (2) Resort to any remedy for breach (ss. 402.703 or 402.711), even though the aggrieved party has notified the repudiating party that the aggrieved party would await the latter's performance and has urged retraction; and
>
> (3) In either case suspend the aggrieved party's performance of the contract or proceed in accordance with s. 402.704 on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods.

Kerry denies that it repudiated any of the contracts when it informed OPC in May 2019 that its orders wouldn't be filled until November 2019. Alternatively, Kerry contends that OPC waived any repudiation.

10

### 1) Did Kerry repudiate the contracts on May 31?

The UCC doesn't define what qualifies as repudiation. But the Wisconsin Supreme Court has defined it as "a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Wisconsin Dairy Fresh, Inc. v. Steel & Tube Products Co.*, 20 Wis. 2d 415, 427, 122 N.W.2d 361 (1963).

Kerry contends that it didn't repudiate the contracts on May 31. Rather, Kerry says it only requested a delay. Kerry cites the statement in *Wisconsin Dairy* that "the expression of doubt as to whether the ability to perform in accordance with the contract will exist when the time comes, is not a repudiation, nor is a request for delay, or a request for cancellation, a repudiation." *Id.* at 427–28 (footnotes omitted). *Wisconsin Dairy* didn't involve a request for delay, and the supreme court didn't elaborate on this point. But it must be reconciled with the supreme court's previous statement that a party to a contract may repudiate by stating "that he will not render the promised performance when the time fixed for it in the contract arrives." The court reads these statements to mean that a party doesn't repudiate by asking for a modification, but if a seller informs the buyer that it simply won't be able to perform at the promised time, that may qualify as a repudiation. Any other reading would allow the seller to avoid repudiation by seeking a delay years in the future.

This is consistent with *Amberg Granite Co. v. Marinette Cty.*, which upheld a finding that a request for an extension of time qualified as a repudiation under the circumstances. 247 Wis. 36, 42, 18 N.W.2d 496, 498 (1945). The court stated that repudiation occurs if it "clearly appear[s], not only that defendant could not do the work within the time, but that his failure

11

in respect of this matter would be so material as to make his performance essentially different from his promise."

The question remains whether Kerry's projected delay was so substantial that it qualifies as repudiation. As already discussed, the parties' contracts included "estimated" fulfillment dates, not strict deadlines. But Kerry was still required to perform within a reasonable time, and the estimated dates provide a benchmark for determining what an unreasonably delay would be. If the new fulfillment date was outside the scope of what would be a reasonable time for performance, that would qualify as repudiation.

Neither side discusses what a "reasonable time" for performance would have been in this case. OPC assumes that any delay was unreasonable, and Kerry assumes that any delay was reasonable. What constitutes a reasonable time under the circumstances is a question of fact, *Singler v. Zurich Am. Ins. Co.*, 2014 WI App 108, ¶ 22, 357 Wis. 2d 604, 617, 855 N.W.2d 707, 713, so a jury will have to make that determination.

### 2) Did OPC waive repudiation?

Even if it repudiated the parties' agreement on May 31, Kerry says that OPC waived repudiation by continuing to seek performance until July 26. Kerry's position appears to be that OPC was required to cancel the contract immediately upon learning that Kerry had repudiated. This contention is inconsistent with the UCC, which allows the nonbreaching party to "await performance" for "a commercially reasonable time" after a repudiation. Wis. Stat. § 402.610(1). If the nonbreaching party continues with its own performance after repudiation or takes other actions affirming the contract, that may qualify as a waiver. *See Columbia Mfg. Co. v. Hastings*, 121 F. 328 (7th Cir. 1902) (nonbreaching party waived repudiation by performing part of the contract); *Long Inv. Co. v. O'Donnel*, 3 Wis. 2d 291, 299,

88 N.W.2d 674, 678 (1958) (nonbreaching party waived repudiation by retaining all of down payment when contract's liquidated damages clause would have allowed party to keep only one third of that); Wis. Stat. § 402.610, Uniform Commercial Code, Comment 4 ("[T]he aggrieved party is left free to proceed at any time with his options under this section, unless he has taken some positive action which in good faith requires notification to the other party before the remedy is pursued."). But OPC didn't perform on the contract or take any other actions affirmatively signaling waiver. Rather, it continued asking Kerry, both directly and through Focus Brands, to improve the November fulfillment dates.

The repudiating party "cannot claim that [the nonbreaching party] waived [its] rights simply by urging performance." *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 621–22 (2000). Stated another way, "[t]he injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation." Restatement (Second) of Contracts § 257 (1981). That is what happened in this case. OPC continued urging performance until July 25, when Kerry informed OPC that the November 1 fulfillment date hadn't changed.

OPC waited nearly two months after the alleged repudiation before cancelling the contracts. That's not an insignificant amount of time, but Kerry doesn't point to any actions it took during the interim in reliance on OPC's failure to cancel sooner. In any event, neither side explains why the amount of time OPC waited was commercially reasonable or unreasonable as a matter of law under § 402.610(1). So that is another issue that the jury will have to resolve.

Kerry also says that OPC's request on July 25 for an August 15 fulfillment date was a request to modify the contract, which qualifies as a waiver. Kerry cites Wis. Stat. § 402.209(4),

but that provision relates to waivers of the general requirement that modifications to a contract must be in writing. *See Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶ 20 n.8, 290 Wis. 2d 264, 275, 714 N.W.2d 530, 535. It has nothing to do with waivers of a repudiation. It would make little sense to say that urging performance with the original terms of the contract doesn't qualify as waiver, but an attempt to compromise does. Kerry didn't accept OPC's requested modification, so the request had no legal effect.[4]

It's true that on July 29 Kerry began discussing "the possibility for August production" with OPC. But that was three days after OPC had cancelled the contracts, so it was too late. In any event, Kerry didn't provide OPC with any evidence or even assurance that Kerry would be able to meet an August deadline. *Cf.* Wis. Stat. § 402.609 (party to sales contract has a "right to adequate assurance of performance"). In light of Kerry's previous delays, OPC wasn't required to accept an unsupported statement about a "possibility" for fulfilling its orders.

### c. Breach by failure to meet the fulfillment date

OPC contends that Kerry materially breached the contract by failing to fulfill the orders by July 1 and July 15, the dates identified in the order acknowledgements. The question is whether OPC would have been entitled to cancel the contracts on July 26, when Kerry was 10 to 25 days past the estimated dates, even if Kerry hadn't repudiated the contracts in May.

The court has rejected OPC's contention that the dates in the orders represented strict deadlines. But Kerry was still required to fulfill the orders in a reasonable time. What's reasonable depends on the circumstances, which, in this case, includes the undisputed facts that the parties had agreed to an estimated date, some of the orders at issue had already been

---

[4] Kerry also cites Wis. Stat. § 402.208 and Wis. Stat. § 401.303, but those statutes relate to course of performance, not waiver.

delayed multiple times, and OPC informed Kerry before submitting its May orders that further delays would affect OPC's ability to supply its own customers. Again, neither side develops an argument on what a reasonable time is under those circumstances, so the jury will have to make that determination.

The general rule is that a party must provide notice "fixing a reasonable time for performance" before cancelling a contract. *Haislmaier v. Zache*, 25 Wis. 2d 376, 384, 130 N.W.2d 801, 805 (1964). *See also* Wis. Stat. § 402.609. A reasonable jury could find that OPC complied with the rule by submitting a new request asking for August 15 fulfillment dates, which Kerry rejected.

To sum up: a reasonable jury could find that OPC was entitled to cancel the contracts on July 26 in light of Kerry's earlier repudiation. Alternatively, a reasonable jury could find that Kerry breached the contracts by failing to fulfill OPC's orders within a reasonable time. The court will allow OPC to proceed to trial on both theories of breach of contract.

### 2. Affirmative defenses

Kerry asserts affirmative defenses for waiver, estoppel, and "commercial impracticability/impossibility."[5] Kerry moves for summary judgment on its "impracticability/impossibility" defense; OPC moves for summary judgment on all three defenses.

### a. Waiver

Kerry asserts in its answer that OPC waived any breaches by "accepting deliveries of yogurt chips that were allegedly untimely or incomplete and cancelling the purchase orders at

---

[5] Kerry also asserts a defense for failure to mitigate damages, which the court will discuss in the context of Kerry's other objections to OPC's damages.

issue in OPC's First Amended Complaint." Dkt. 93, at 37. The court already determined that OPC didn't waive any breaches by submitting new purchase orders seeking fulfillment dates on August 15. As for previously accepting late deliveries and cancelling the orders originally scheduled for March, April, and May 2019, OPC isn't asserting claims for Kerry's failure to meet those dates. The court discerns no basis for asserting that OPC waived timely performance of the orders scheduled for July, so the court will grant summary judgment to OPC on this defense.

### b. Estoppel

An equitable estoppel defense has four elements: (1) action or non-action, (2) on the part of one against whom estoppel is asserted, (3) which induces reasonable reliance thereon by the other, either in action or non-action, and (4) which is to his or her detriment. *Vill. of Hobart v. Brown Cty.*, 2005 WI 78, ¶ 36, 281 Wis. 2d 628, 647, 698 N.W.2d 83, 92. Kerry relies on the same grounds to support this defense as it did for its waiver defense: OPC accepted late deliveries, agreed to extend fulfillment dates, and attempted to modify the agreements to allow for an August 15 delivery. But Kerry doesn't explain how it relied on any of that conduct as it relates to OPC's decision to cancel the contract on July 26. So the court will grant summary judgment to OPC on this defense.

### c. Impracticability

This defense comes from Wis. Stat. § 402.615(1), and its purpose is to "shift[] risk to the party better able to bear it, either because he is in a better position to prevent the risk from materializing or because he can better reduce the disutility of the risk (as by insuring) if the risk does occur." *N. Indiana Pub. Serv. Co. v. Carbon Cty. Coal Co.*, 799 F.2d 265, 278 (7th Cir. 1986).

An impracticability defense requires the defendant to show three things: (1) a contingency occurred; (2) the contingency made performance impracticable; and (3) the nonoccurrence of that contingency was a basic assumption upon which the contract was made. *Luria Bros. & Co. v. Pielet Bros. Scrap Iron*, 600 F.2d 103, 111 (7th Cir. 1979). Like many other courts, the Court of Appeals for the Seventh Circuit has construed the third element to mean that the alleged contingency wasn't foreseeable by the defendant at the time of contracting:

> The applicability of the defense of commercial impracticability, then, turns largely on foreseeability. The relevant inquiry is whether the risk of the occurrence of the contingency was so unusual or unforeseen and the consequences of the occurrence of the contingency so severe that to require performance is to grant the buyer an advantage he did not bargain for in the contract. If the risk of the occurrence of the contingency was unforeseeable, the seller cannot be said to have assumed that risk. If the risk of the occurrence of the contingency was foreseeable, that risk is tacitly assigned to the seller. The seller's failure to provide a contractual excuse against the occurrence of a foreseeable contingency may be deemed to be an assumption of an unconditional obligation to perform. Phrased somewhat differently, if a contingency is foreseeable, the section 2–615 defense is unavailable because the party disadvantaged by the fruition of the contingency might have contractually protected itself.

*Waldinger Corp. v. CRS Grp. Engineers, Inc., Clark Dietz Div.*, 775 F.2d 781, 786 (7th Cir. 1985) (citations omitted). This view is consistent with Wisconsin law, which requires the defendant to show that its inability to perform is "because of circumstances beyond his or her control and not within his or her ability to foresee." WIS JI-CIVIL 3063; *see also* WIS JI-CIVIL 3062 ("[I]f performance becomes impossible by reason of contingencies which should have been foreseen by a party, then such party is not excused from the duty to perform.").

Kerry contends that three events occurred at its production facility that meet the requirements of § 402.615: (1) from April 26 through April 29, 2019, some of Kerry's

production lines were down because Kerry needed to replace a belt in one of its machines; (2) from May 24 to June 14, 2019, Kerry shut down some of its equipment because of listeria contamination caused by employees placing equipment on the floor and failing to clean it properly; and (3) there was high employee turnover in April, May and June 2019.[6] OPC doesn't dispute that these three events are contingencies within the meaning of § 402.615, but it denies that the events rendered performance impracticable and that the events weren't foreseeable.

As for whether performance with the contracts was impracticable, Kerry doesn't adduce specific evidence of exactly how much its production was limited by the mechanical breakdown, the listeria contamination, and the employee turnover. But it admits that it still had some production capacity and that it was continuing to fill orders for other customers. Dkt. 159, at 73. Under those circumstances, the seller must allocate its resources in a "fair and reasonable" manner. Wis. Stat. § 402.615(2). Kerry says that it had a "customer segmentation" plan to determine how to prioritize orders, Dkt. 164, ¶ 254, but it doesn't explain what the plan was, let alone show that the plan was fair and reasonable. So Kerry has failed to adduce evidence that it met this element of the impracticability defense.

Kerry also failed to meet to its burden to show that none of the events it cities were foreseeable. The impracticability defense is generally reserved for events caused by a third party or acts of nature. *See* 30 Williston on Contracts § 77:1, at 280 (4th ed.). The examples listed in the official comments for § 402.615 include war, embargo, local crop failure, and loss of a supplier. Wis. Stat. § 402.615, comment 4. Other events recognized by Wisconsin courts include fires, sickness, and death. *See* 2 *Contract Law in Wisconsin* § 12.56, at 12-68 (5th ed.)

---

[6] Kerry doesn't rely on the alleged power outage that it cited in one of its emails to OPC as a reason for the delays.

(citing cases). This is consistent with the view that "the offending party cannot be heard to cry that performance is impracticable" if "the adverse event is due to the fault of the obligor." Williston, § 77:1, at 280. The events at issue in this case were neither acts of nature nor caused by a third party. And Kerry cites no authority for the view that equipment breakdown, contamination caused by its own employees' negligence, or employee turnover can qualify for the defense. *See Louis Dreyfus Corp. v. 27,946 Long Tons of Corn*, 830 F.2d 1321, 1323 (5th Cir. 1987) (defense not available for flooding of ship caused by mechanical defect that defendant could have discovered and corrected); *United States v. Kelley*, 145 F.R.D. 432, 435 (E.D. Mich. 1993) (rejecting impracticability defense for failure to perform caused by maintenance difficulties); *Chemetron Corp. v McLouth Steel Corp.*, 381 F. Supp. 245, 256 (N.D. Ill. 1974) (rejecting impracticability defense for mechanical breakdowns).

Even if the court assumes that the types of events cited by Kerry could qualify for the defense under some circumstances, Kerry hasn't adduced evidence that any of the actual events weren't foreseeable. Rather, Kerry relies on testimony that it didn't foresee any of the events. *See*, *e.g,* Dkt. 164, ¶ 278 (citing vice president's testimony that she "did not expect those issues"). But the question is whether the contingency "should have been foreseen," WIS JI-CIVIL 3062, not whether the seller actually knew the problem was coming. *See Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1176 (10th Cir. 2008) (question is whether contingency was "objectively foreseeable"); *Teco Coal Corp. v. Orlando Utilities Comm'n*, No. 07-CV-444-KKC, 2010 WL 8750622, at *10 (E.D. Ky. Sept. 17, 2010) ("[I]t matters not whether the seller thought a certain event would not occur, but what contingencies were reasonably foreseeable at the time [the] contract was made." (quoting *Alamance County Board of Education v. Bobby Murray Chevrolet, Inc.*, 465 S.E.2d 306, 311 (N.C. Ct. App. 1996)).

Kerry hasn't cited any evidence that it was unable to plan for the maintenance issues, better train its employees to prevent mishandling of equipment, hire more employees, or create workplace conditions that would decrease turnover. In fact, OPC cites evidence that Kerry had notice of all these issue weeks, months, or even years before they occurred. *See* Dkt. 169, ¶ 250 (citing testimony that Kerry knew in January 2019 that employee turnover was a problem); Dkt. 106 (Ellis Dep. 80:17–82:5) (testimony that Kerry knew in early 2019 that employees weren't receiving adequate training); Dkt. 169, ¶¶ 267, 280–285 (citing testimony and documents that Kerry knew since 2018 of problems with listeria contamination caused by employees' failure to clean properly); *id.*, ¶ 246 (citing evidence that Kerry was aware in February 2019 that the belt needed to be replaced).

Kerry has failed to adduce evidence that would permit a reasonable jury to find that it is entitled to the impracticability defense, so the court will grant summary judgment to OPC on this defense.

### 3. Damages

Damages are an element of a breach of contract claim. *Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 807, 714 N.W.2d 582. Kerry argues that OPC's breach of contract claims should be dismissed in their entirety because OPC hasn't adduced any evidence of damages that were caused by Kerry's alleged breaches.

This argument doesn't require extended discussion. OPC cites evidence that it lost accounts as a result of delays in fulfilling orders and that all of the packaging and product it had already produced became worthless when OPC had to reformulate the product. Dkt. 108 (Vigilante Dep. 215:23–218:12) and Dkt. 124-1. Kerry argues that these damages weren't reasonably foreseeable because the purchase orders didn't state that time is of the essence and

the parties had a course of dealing that allowed delays. These are the same arguments that Kerry made in the context of arguing that there was no breach, and the court has concluded that a reasonable jury could reject those arguments. At this stage, OPC doesn't have to prove a specific amount of damages to sustain its breach-of-contract claims, so the court will deny Kerry's motion for summary judgment on these claims.

The court will discuss disputes related to specific types of damages in Part E of the opinion.

## B. Promissory estoppel

OPC asserts a claim for promissory estoppel in the alternative to its contract claims. Dkt. 83, at 23. Kerry moves for summary judgment on this claim, contending that the parties' contracts bar an equitable claim like promissory estoppel.

Parties may bring a claim for promissory estoppel if they rely on a promise to their detriment. *See Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 697–98, 133 N.W.2d 267, 275 (1965). But the claim is generally viewed as a "substitute" for a breach-of-contract claim when consideration is lacking. *See id.*

OPC cites *Bertha v. Remy Int'l, Inc.*, 414 F. Supp. 2d 869, 881 (E.D. Wis. 2006), for the proposition that "parties may present alternative and mutually exclusive claims in a complaint." That's correct, because Federal Rule of Civil Procedure 8(d)(2) allows plaintiffs to plead claims in the alternative. But this case is well past the pleading stage now. OPC's promissory estoppel claim is based on the view that it doesn't have an enforceable contract with Kerry. Both parties agree that they formed contracts through the purchase orders and order acknowledgements, so there is no basis for a promissory estoppel claim.

Even when there is a contract, a party may bring a promissory estoppel claim when "the contract fails to embody essential elements of the total business relationship of the parties." *Kramer v. Alpine Valley Resort, Inc.*, 108 Wis. 2d 417, 421, 321 N.W.2d 293, 295 (1982). But OPC neither invokes this exception to the general rule nor identifies any promises that Kerry made outside the order acknowledgements that could support a promissory estoppel claim. So the court will grant Kerry's motion for summary judgment on this claim.

## C.  Washington Consumer Protection Act

The Washington Consumer Protection Act (CPA) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. OPC says that it is protected by the CPA because it is a Washington citizen. It alleges that Kerry violated the CPA by falsely representing that it would fulfill OPC's orders on time and by failing to disclose the listeria contamination. To prevail on a claim under the CPA, the plaintiff must prove that the defendant committed a deceptive act or practice that occurred in trade or commerce, affected the public interest, and caused injury to the plaintiff's business or property. *Michael v. Mosquera–Lacy*, 200 P.3d 695, 698–99 (Wash. 2009).

Kerry seeks summary judgment on this claim on two grounds that apply to both types of alleged deceptive conduct: (1) under choice-of-law principles, Wisconsin law rather than Washington law applies to this case; and (2) the alleged conduct didn't affect the public interest because OPC hasn't adduced evidence that anyone other than OPC was harmed by the alleged deception. Kerry also challenges each part of this claim on individual grounds. As for the alleged misrepresentations about fulfillment dates, Kerry says that they weren't deceptive because time was not of the essence, that the representations can't be brought as a CPA claim because they are covered by the breach-of-contract claim, and that OPC hasn't adduced evidence that Kerry

22

intentionally deceived OPC about fulfillment dates. As for the failure to disclose the listeria contamination, Kerry says that it didn't have a duty to disclose the reasons for the delay.

Both parties assume that the court must conduct a choice-of-law analysis for a claim under the CPA, even if the statute by its own terms would apply to out-of-state conduct. *See Thornell v. Seattle Serv. Bureau, Inc*., No. C14-1601-MJP, 2016 WL 3227954, at *3 (W.D. Wash. June 13, 2016) (concluding that court must apply choice-of-law analysis to CPA because "the CPA does not include an explicit choice-of-law directive"). And both parties agree that the forum state's choice-of-law rules are controlling. *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (federal court "applies the choice-of-law rules of the forum state to determine which state's substantive law applies"). Under Wisconsin law, there is a presumption that the law of the forum state applies unless it is clear that the contacts in the non-forum state are of greater significance than the contacts in the forum state. *Drinkwater v. Am. Family Mut. Ins. Co*., 2006 WI 56, ¶ 40, 290 Wis. 2d 642, 714 N.W.2d 568; *State Farm Mut. Auto Ins. Co. v. Gillette*, 2002 WI 31, ¶ 51, 251 Wis. 2d 561, 641 N.W.2d 662.

OPC says that Washington law should apply because both parties are incorporated in Washington. Dkt. 157, at 51. But that's incorrect. It's undisputed that Kerry is incorporated in Delaware, and its principal place of business is in Wisconsin. Dkt. 164, ¶ 1 and Dkt. 169, ¶ 13. If Kerry were incorporated in Washington, the parties' citizenship would not be diverse, and the court wouldn't be able to exercise jurisdiction under 28 U.S.C. § 1332.

The only relevant connection with Washington that OPC identifies is that OPC suffered injuries in Washington. That is a relevant factor to consider, but so is the location of the alleged wrongful conduct. *See NCR Corp. v. Transp. Ins. Co*., 2012 WI App 108, ¶¶ 12–13,

344 Wis. 2d 494, 501, 823 N.W.2d 532, 535. Kerry's alleged misrepresentations and omissions occurred in Wisconsin, so that factor points to applying Wisconsin law.

When the contacts of one state aren't clearly more significant than the other, Wisconsin courts look at other factors, such as the predictability of results, the simplification of the judicial task, and the advancement of the forum state's governmental interest. *Id.* at ¶ 14. OPC doesn't persuasively explain why any of those factors would favor Washington law. If anything, it would be simpler and more predictable to apply Wisconsin law to Wisconsin conduct because that would give Kerry clearer notice which state's rules it must follow. And Wisconsin's interests wouldn't be advanced by applying Washington law. Wisconsin has its own statute aimed at deceptive conduct, Wis. Stat. § 100.18. The court previously dismissed OPC's claim under § 100.18 because OPC didn't satisfy all of its requirements. Dkt. 75, at 7–9. If Wisconsin wished to protect OPC from the alleged conduct at issue here, the legislature could have written a broader statute.

But even if the court assumes that OPC may assert a claim under the CPA, the claim fails. OPC doesn't respond to any of Kerry's arguments regarding why the alleged conduct doesn't violate the CPA. Specifically, OPC doesn't cite any evidence that anyone else was harmed by the alleged conduct or that any misrepresentations were intentional, and it doesn't explain why OPC had a duty to disclose all of the reasons for the delays. So OPC has forfeited this claim. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) ("[B]y failing to respond in any way to any of the arguments advanced by Defendants regarding counts 9, 14, 15, and 16, Plaintiffs have waived their claims.").

24

### D. Unclean hands and duty of good faith

OPC devotes a substantial portion of its briefs to arguments about the doctrine of unclean hands. It also contends that Kerry breached its duty of good faith and fair dealing. The alleged conduct that forms the basis of OPC's bad-faith claim appears to be the same as the alleged conduct that gives Kerry unclean hands. Specifically, OPC says that Kerry: (1) knew when it entered the contracts that it would not be able to meet any of the fulfillment dates; (2) prioritized other customers' orders; and (3) misrepresented the reasons for the delays. Dkt. 157, at 4, 19. This conduct, OPC says, "precludes Kerry from any relief in this Lawsuit." *Id.* at 5.

The above conduct was also the basis for OPC's claims for common-law fraud and violations of Wis. Stat. § 100.18, which the court dismissed for failure to state a claim. Dkt. 75. OPC seems to be trying to repurpose its allegations, but it doesn't clearly explain how the doctrine of unclean hands or the duty of good faith applies to this case.

The doctrine of unclean hands is an equitable doctrine that "a plaintiff who seeks affirmative equitable relief" cannot prevail if it engaged in "substantial misconduct" that caused the harm about which the party now complains. *S & M Rotogravure Serv., Inc. v. Baer*, 77 Wis. 2d 454, 466, 252 N.W.2d 913, 918–19 (1977); *Timm v. Portage Cty. Drainage Dist.*, 145 Wis. 2d 743, 752–53, 429 N.W.2d 512 (Ct. App. 1988). OPC cites no authority for the view that the doctrine has any relevance to determining whether a party breached a contract. If OPC means to contend that the doctrine is relevant to determining whether Kerry should prevail on its affirmative defenses, the court is granting summary judgment to OPC on those defenses, so that issue is moot.

The duty of good of faith and fair dealing is inherent in every contract, and a breach of the duty is simply one type of a breach of contract. *See Home Valu, Inc. v. Pep Boys-Manny, Moe & Jack of Del., Inc.*, 213 F.3d 960, 965–66 (7th Cir. 2000). Courts use this duty as a rule of construction to "fill contractual gaps," *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 705 (7th Cir. 1992), to prevent parties from acting in a manner that "follow[s] the letter but not the spirit of an agreement," *Beidel v. Sideline Software, Inc.*, 2013 WI 56, ¶ 27, 348 Wis. 2d 360, 842 N.W.2d 240. In this case, OPC doesn't distinguish its bad-faith theory from its other contract theories, it doesn't cite any authority in support of the application of the theory to the facts of this case, and it doesn't explain how Kerry followed the letter but not the spirit of the agreements.

At this point, the court can discern no relevance that the doctrine of unclean hands or the duty of good faith has to the issues that remain for trial. If OPC wishes to present evidence or obtain a jury instruction on either theory, OPC will need to file a motion in limine supported by authority explaining how the evidence is relevant and why the instruction is warranted.

## E.  Damages

The parties' disputes about damages issues fall into three categories: (1) whether OPC failed to mitigate its damages; (2) whether OPC's compensatory damages should be limited in several ways; and (3) whether OPC may recover punitive damages. Both sides move for summary judgment on the first issue, and Kerry moves for summary judgment on the last two issues.

### 1.  Failure to mitigate damages

Every injured party has a duty to mitigate, but a plaintiff's failure to mitigate damages is an affirmative defense that the defendant must prove. WIS JI-CIVIL 1731. Kerry argues that

26

OPC failed to mitigate its damages for two reasons: (1) it declined to accept Kerry's proprietary formula of its yogurt cubes in exchange for a waiver of damages; and (2) it declined Kerry's offer of August 2019 delivery dates.

The court has already determined that OPC wasn't required to engage in further negotiations with Kerry regarding possible fulfillment dates in August 2019, so the court will grant summary judgment to OPC on that issue. As for the contention that OPC should be penalized for failing to accept the yogurt cube formula, Kerry's position can be summarized as "Heads I win, tails you lose." If OPC had accepted the formula, it would have been prohibited from recovering any damages under the proposed agreement, regardless how useful the formula was. And under Kerry's view, OPC is also prohibited from obtaining damages as a result of declining Kerry's offer. Not surprisingly, Kerry cites no authority to support its position.

A party has a duty "to use *reasonable* means under the circumstances to avoid or minimize the damages." *Kuhlman, Inc. v. G. Heileman Brewing Co.*, 83 Wis. 2d 749, 752, 266 N.W.2d 382, 384 (1978) (emphasis added). If Kerry had offered OPC the formula without strings attached, Kerry would have a strong argument that OPC's refusal was unreasonable. But it isn't reasonable to require a party to forfeit its rights in exchange for a chance of mitigation. *See* 24 Williston on Contracts § 64:31, at 175 (4th ed. 2018) ("A plaintiff may also charge injurious avoidable consequences to the defendant, if in order to avoid them, the plaintiff would have to forego profits or advantages to which it would be entitled by the terms of the contract."); *Seaboard Music Co. v. Germano*, 24 Cal. App. 3d 618, 623, 101 Cal. Rptr. 255, 258 (Ct. App. 1972) ("The rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights.").

27

Kerry identifies no other ways that OPC failed to mitigate its damages. Because the two ways identified by Kerry aren't reasonable, the court will grant OPC's motion for summary judgment on Kerry's affirmative defense of failure to mitigate damages.

## 2.   Categories of compensatory damages

Kerry contends that OPC isn't entitled to four categories of compensatory damages: (1) lost profits after August 2019; (2) damages related to any yogurt cube flavors other than the five requested in the purchase orders at issue; (3) damages related to reformulating and relaunching the smoothie mixes because OPC began reformulating its mixes before any alleged breaches; and (4) royalty fees that OPC had to pay Focus because OPC would have had to pay those anyway.

Kerry's first contention is based on the view that OPC forfeited damages accruing after August 2019 because Kerry offered the possibility of an August fulfillment date. Again, the court has concluded that OPC wasn't required to engage in further negotiations when Kerry asked OPC whether it would accept new dates. So the court will deny Kerry's summary judgment motion on this issue.

OPC doesn't substantively respond to Kerry's remaining three damages contentions. Instead, OPC says that Kerry's damages arguments are "inappropriate" because the parties will "address[] [those arguments] at the damages stage, pursuant to the Court's Bifurcation Order, after liability has been resolved." Dkt. 157, at 44. The problem with this argument is that the court hasn't issued an order bifurcating liability and damages issues for the purpose of discovery or summary judgment. OPC cites the preliminary pretrial conference order, but that order states only that "[t]rial shall be to a jury of eight and shall be bifurcated." Dkt. 79, at 5. The order doesn't create separate phases of discovery, and it doesn't prohibit either party from

raising damages issues in a summary judgment motion. As a result, OPC was required to respond to Kerry's arguments, and OPC's failure to do so means that it has forfeited its right to these categories of damages. *Foxx*, 815 F.3d at 1078.

### 3. Punitive damages

OPC's amended complaint includes a request for punitive damages. But punitive damages aren't available for a breach of contract. *Mohns Inc. v. BMO Harris Bank Nat'l Ass'n*, 2021 WI 8, ¶ 58, 395 Wis. 2d 421, 456, 954 N.W.2d 339, 356. All of OPC's remaining claims are for breach of contract, so the court will grant Kerry's motion for summary judgment on the issue of punitive damages.

## F. Conclusion

The court will deny summary judgment to both sides on the key questions of whether Kerry repudiated the contracts, whether Kerry failed to perform the contracts within a reasonable time, and whether OPC cancelled the contracts within a reasonable time after any repudiation by Kerry. But the court will dismiss OPC's claims for promissory estoppel and for violations of the CPA, as well as Kerry's affirmative defenses. The court will grant Kerry's motion for summary judgment on the issue of punitive damages as well as damages related to any yogurt cube flavors other than the five requested in the purchase orders, damages related to reformulating and relaunching the smoothie mixes, and royalty fees that OPC had to pay.

ORDER

IT IS ORDERED that:

1. Plaintiff Oregon Potato Company's motion for summary judgment, Dkt. 120, is GRANTED in part and DENIED in part. The motion is GRANTED on defendant Kerry, Inc's affirmative defenses for waiver, estoppel, impracticability, and failure to

mitigate damages, and those defenses are DISMISSED. The motion is DENIED in all other respects.

2. Kerry's motion for summary judgment, Dkt. 114, is GRANTED in part and DENIED in part. The motion is GRANTED on Oregon Potato Company's claims for promissory estoppel and for violations of the Washington Consumer Protection Act and on the following damages issues: (1) punitive damages; (2) damages related to any yogurt cube flavors other than the five requested in the purchase orders identified in the amended complaint; (3) damages related to reformulating and relaunching the smoothie mixes; and (4) royalty fees that OPC had to pay. The claims for promissory estoppel and violations of the Washington Consumer Protection Act are DISMISSED.

Entered December 16, 2021.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge